Filed 3/15/23  In re M.Y. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re M.Y., a Person Coming Under the Juvenile Court Law. | B319662 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 19CCJP05288A |
| Plaintiff and Respondent, | |
| v. | |
| R.Y., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Lisa A. Brackelmanns, Judge Pro Tempore of the Juvenile Court.  Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Respondent.

————————

Mother appeals the juvenile court's order terminating her parental rights to her daughter M.Y. She contends the juvenile court erred in finding the beneficial parent relationship exception to adoption did not apply under *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). She also contends the court and the Los Angeles County Department of Children and Family Services (DCFS) failed to make an adequate inquiry under the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) and related California law (Welf. & Inst. Code, § 224 et seq.).[1] We find no prejudicial error and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.** ***Child welfare history***

Mother and father have a history with the dependency court.[2] M.Y.'s three older siblings C.Y., J.Y., and T.Y. were declared dependents of the juvenile court, primarily due to parents' substance abuse, between May 2003 and May 2009. The court granted legal guardianship of C.Y. and J.Y. to paternal grandmother, and terminated parents' parental rights as to T.Y., who was adopted.

In May 2012, M.Y. (born April 2012) was declared a dependent of the juvenile court after her meconium tested positive for methamphetamine. The court granted parents,

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code. Because ICWA uses the term "Indian," we do the same for consistency, although we recognize other terms are preferred. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

[2]     Father is not a party to this appeal.

who were married, family reunification services and placed M.Y. with paternal cousin Lisa and her husband. Parents reunified with M.Y., and the court terminated its jurisdiction in December 2013.

**2.** ***Current petition***

M.Y. again came to DCFS's attention on August 10, 2019, when she and mother were seen walking around a mall parking lot. Mother appeared disheveled and did not know what day it was; M.Y. had blisters on her feet and her clothes were dirty. Mother was homeless. She had been using vouchers to stay at hotels but had checked out of the last one.

The responding DCFS social worker (CSW) spoke to relatives but could not reach mother. According to paternal cousin Kristen, mother had a history of bipolar disorder, alcohol abuse, and methamphetamine use. In 2018, the family had become homeless. Lisa and her husband let the family stay in a camper parked in their yard—M.Y. slept in the house with Lisa and her husband and parents stayed in the camper. The family left in November 2018 after Lisa and her husband found drug paraphernalia in the camper. Kristen said DCFS was going to open a new case with the family, but mother sent M.Y. to live with maternal uncle in Oregon.

Maternal uncle confirmed mother brought M.Y. to Oregon in January 2019 to stay with him and his wife. Mother returned to Oregon in March and stayed until July 3, 2019, when she and M.Y. left. In June 2019, mother was arrested. Uncle had called the police, believing mother was having a bipolar episode, when he found her screaming and smashing the windows of her car. Mother and M.Y. returned to California after the incident.

3

Maternal uncle asked that he and his wife be considered for placement.

Mother and M.Y. had "show[n] up" at Lisa's house on August 11. A CSW interviewed mother and M.Y. there. On returning from Oregon, mother and M.Y. stayed with maternal grandmother and then lived in hotels. Mother had separated from father in January 2019. M.Y. said father sometimes stayed the night at their hotel.

Mother denied current drug use, stating she last used methamphetamine nine months earlier. She said she'd used methamphetamine " 'on and off' " since 2005—she "would get clean and then relapse." Mother last had been in an inpatient treatment program in 2014. She told the CSW she drank alcohol only " 'sporadically' " and denied any mental health diagnoses. She said homelessness was the only issue impacting the family.

M.Y. confirmed she'd been living in Oregon with her uncle and was not sure why she returned to California. She denied having to sleep outside. M.Y. felt happy and safe with mother and father.

Lisa and her husband had agreed to allow mother to live in the camper again if she enrolled in Narcotics Anonymous. Mother was willing to do so and to drug test that day for DCFS.[3]

On August 14, 2019, DCFS obtained an expedited removal order detaining M.Y. from parents. Mother asked that M.Y. be left in Lisa's and her husband's custody. Lisa and her husband

---

[3]    Mother's August 12, 2019 drug test results were negative for all substances, but her test was diluted.

were willing to adopt M.Y. if parents did not reunify with the child.

On August 16, 2019, DCFS filed a section 300 petition on behalf of M.Y. alleging parents' substance abuse rendered them incapable of caring for M.Y. and had led to the permanent placement of M.Y.'s older siblings. At the August 19 detention hearing, the court detained M.Y. from parents and ordered they have monitored visitation.[4]

3.    *Jurisdiction and disposition*

A DCFS dependency investigator (DI) interviewed M.Y. at Lisa's home on September 5, 2019. M.Y. missed her parents. She last had seen father in court and had not talked to her mother "since she left." M.Y. stated, " '[M]aybe I can see my mom and dad for an hour or two and when they get a house, maybe I'd like to see them more[;] I only like to visit them.' " M.Y. changed the subject when asked about staying in hotels and parents' behaviors. She denied any physical or sexual abuse.

On September 17, 2019, the CSW met with mother at her treatment center, where she had been voluntarily admitted earlier that month. Mother told the CSW she had taken methamphetamines "right before coming" because she feared the facility otherwise would not deem her in need of treatment. Mother denied having used any type of substance in the weeks leading up to M.Y.'s detention. Mother wanted to divorce father, whom she described as a "functional addict." She believed father was "toxic" for her, and she had stayed with him because he

---

[4]    Father appeared at the hearing, but mother did not. She was arraigned on October 11, 2019.

was her " 'dealer.' "  Mother said father had hit her in the past, including when she had returned to California while M.Y. was in Oregon.  Mother said she would do whatever was necessary to reunify with M.Y.

On October 1, 2019, mother transitioned to an outpatient program.  The DI interviewed her the next day.  Mother appeared "scattered in her thoughts," but was cooperative and able to maintain eye contact.  Mother, then 52 years old, said she began "smoking pot" at 12 and began experimenting with other drugs and alcohol at 19.  She tried methamphetamine in 2001 when she met father.  Mother had been using meth off and on since then; she said she'd been sober about five years over the years.  She had a " '[h]ard time' " getting off meth and into a treatment program.

Mother told DCFS her parents divorced when she was about one year old.  Her stepfather raised her; she had minimal contact with her biological father.  Mother left home at age 11 and lived with an aunt, moving to an adolescent home when she was 12.

Mother had a monitored visit with M.Y. at her inpatient facility in late September.  Mother was appropriate and told M.Y. she loved her; M.Y. appeared comfortable.

DCFS filed its jurisdiction/disposition report on October 10, 2019.  It asserted parents had "an unresolved history of illicit drug abuse," and suspected current methamphetamine use, that rendered them incapable of caring for M.Y.  Mother appeared to be "extremely codependent on father"; she told the DI "every time she completes a program, she returns to father."  DCFS expressed concern that parents' issues were not "one-time incidents, but are indicative of a chronic, long-term

6

pattern of abuse for both of them." DCFS concluded M.Y. could not safely remain with either parent. It recommended parents receive no reunification services.

At the jurisdiction hearing on October 22, 2019, the court sustained the section 300 petition as to mother and father and continued the disposition hearing.

Mother was visiting M.Y. consistently every Sunday. The CSW had no concerns. During a monitored visit in a park on November 9, mother "displayed a positive behavior and engaged properly with [M.Y.]" However, M.Y.'s caregiver said M.Y. "is always concerned about her mother."

Mother's counselor at her outpatient program confirmed mother had attended all group sessions and completed all assignments, had attended more than the required number of AA meetings per week, and had a sponsor. Mother's weekly drug tests had been negative.

At the contested November 18, 2019 disposition hearing, DCFS asked the court to take judicial notice of the sustained petitions, case plans, and minute orders in the earlier dependency case file concerning M.Y. and her siblings. The court admitted those electronic files into evidence, as well as DCFS's most recent report. The court also admitted mother's exhibits, including: a letter from her outpatient program that she was actively engaged in the 12-step program and doing well in treatment; a letter from mother's psychologist that she had been attending weekly sessions since October 8 and had made good progress; and divorce paperwork mother had filed.

DCFS asked the court to bypass reunification services for parents. But M.Y.'s counsel recommended the court provide mother with reunification services. The court ordered M.Y.

removed from parents. It bypassed reunification services for father but granted them for mother. The court ordered mother to participate in a full drug/alcohol program with aftercare, weekly drug testing, a 12-step program, a domestic violence victims support group, parenting classes, individual counseling, and mental health counseling, and to undergo a psychiatric evaluation. Mother was to have monitored visitation for a minimum of six hours per week.

### 4. *Six-month review period*

In a status review report filed April 24, 2020, DCFS noted M.Y. was doing well with Lisa and her husband. She had begun weekly mental health services and was to receive special education services in reading. Lisa and her husband wanted to adopt M.Y. if mother failed to reunify. They loved M.Y. and wanted to give her a loving and stable home.

Mother remained in the outpatient, residential treatment program she had entered on October 1, 2019. She was working at a Wal-Mart and looking for housing outside the program. Mother continued to test negative for drugs and alcohol each week. She also was participating in her other court-ordered services and in the process of beginning individual counseling.

Mother had visited M.Y. for two hours each Saturday at a park near her treatment facility, traveled to visit with M.Y. for special occasions, and called M.Y. daily. The report noted mother and M.Y. appeared "to have a strong bond and [M.Y.] appear[ed] to be comfortable in the mother's presence." With the onset of the pandemic, mother began to visit with M.Y. daily through FaceTime. Mother was concerned about exposing M.Y. to the virus. Mother visited M.Y. in person for her birthday, however, which was important to M.Y.

DCFS assessed mother as in "partial compliance" with her court-ordered programs, as she had yet to participate in individual counseling. DCFS also wanted more time to assess whether mother would remain sober outside the structure and support of her residential program. DCFS recommended the court continue reunification services.

Due to COVID-19-related court closures, the court continued the six-month review hearing from May 2020 to September 2020. DCFS's status review report, filed August 14, noted DCFS had liberalized mother's visits to unmonitored for two hours each (in April), and then increased the time to four hours (in June), and eight hours (in August). Due to mother's work schedule, she could visit M.Y. only one day per week. She telephoned or video called M.Y. on the other days. Mother and M.Y. had "been observed to have a strong bond." DCFS noted M.Y. said she would like to live with mother, but if she couldn't, then she would like to live with her caregivers or for mother to live with M.Y. and her caregivers.

Mother had made substantial progress. She'd completed her full treatment program and continued to remain sober for a year. Mother left the facility in June 2020. She was living with a friend and working full time. She had a driver's license and had saved money to buy a car.[5]

DCFS said "the only obstacle at this time to reunification is housing for the mother." It noted the case was eligible for housing assistance. DCFS recommended the court continue

---

[5]     Mother had stopped taking psychotropic medication, however, believing the medication was not necessary now that she was clean and sober.

reunification services and set a progress hearing in three months to discuss mother's housing and the return of M.Y. to her care.

The court found mother had substantially complied with her case plan. The court ordered DCFS to assess mother for overnight visits. It continued reunification services and set a combined 12-month/18-month review hearing.

5. *Combined 12- and 18-month review period*

In its interim review report filed November 10, 2020, DCFS recommended the court return M.Y. to mother's custody, with DCFS to provide family maintenance services. Mother was living with maternal step-grandfather and on a waiting list for housing. She continued to work full time.

On October 2, 2020, mother began overnight visits with M.Y. at step-grandfather's home each weekend, except for a weekend after she had surgery.[6] She began extended weekend visits with M.Y. on November 6. Mother called M.Y. nightly when not visiting.

M.Y. completed therapy in October 2020; she had met her therapy goals. She participated in a conjoint therapy session with mother and mother's therapist in October.

In a report filed December 3, 2020, however, DCFS told the court it had seen a change in mother's behavior that concerned it. Despite DCFS's earlier home-of-mother recommendation, mother believed DCFS and paternal relatives were colluding against her reunification with M.Y. so M.Y.

---

[6]     Mother took a leave of absence from her job after her mid-October surgery and apparently did not return to work.

could be adopted. Mother repeatedly called and/or texted the CSW and paternal cousin Kristen about this belief.

Mother was to have an extended Thanksgiving visit with M.Y. from November 25 through November 29, 2020, but maternal step-grandfather had a heart attack on November 24. She told the CSW she might have to change the time she picked up M.Y. M.Y. waited for hours, however, before mother called Lisa, crying. She said she would not be able to pick up M.Y. until that Friday morning. On that morning, however, mother texted Lisa, " '[M.Y.] is having so much fun there, I will not be picking her up today.' "

Over the next several days, the CSW, the caregivers, and Kristen received several telephone calls and texts from mother. Mother said she was going to leave step-grandfather's home (where she had fought with another relative) because it didn't matter where she lived—she knew M.Y. would not be returned to her. Mother said she planned to live under the freeway in a tent. Mother continued to accuse DCFS of planning for M.Y. to be adopted, alleging it would receive a $40,000 bonus if she were. She did not attend the scheduled team meeting despite the CSW's encouragement. The CSW asked mother to drug test, but mother said she was sick, and her doctor had told her to quarantine.

Based on mother's behavior, DCFS believed her issues had resurfaced or no longer were being addressed. Mother's mental health appeared to be deteriorating, and DCFS also was concerned mother might be using drugs again. M.Y. appeared to be "picking up on" mother's decline; Kristen and Lisa reported M.Y. was establishing an " 'escape route' " by memorizing the

11

way back to her relatives' homes. M.Y. had been "exhibiting signs of concern and sadness."

At the scheduled December 9, 2020 progress hearing, the juvenile court ordered M.Y. remain in her placement. DCFS was to ensure mother received monitored visits with M.Y. at a minimum of six hours per week. Mother was to continue in her programs and to test.

DCFS learned that, on December 26, 2020, mother had enrolled herself in a 30-day residential treatment program at Discovery House, which she completed on January 25, 2021. Mother had relapsed after step-grandfather died.[7] Her substance abuse counselor wrote DCFS, stating mother had tested negative for all substances at discharge and had been a model client. The counselor noted mother had been diagnosed with PTSD and depression and had been prescribed Prozac. Mother was to enroll in an outpatient program.

The day after her discharge, mother called the CSW and said she was not attending an outpatient program because she " 'knew that she would not be able to reunify with [M.Y.].' " Mother said she was staying with a friend but would not provide the address. The CSW encouraged mother to enroll in aftercare.

In early February, the CSW went to father's apartment to try to visit mother. No one answered the door, but father's neighbors confirmed mother was staying there. A week later, father responded to a message the CSW had left. He said he

---

[7]     According to the substance abuse counselor, mother also had lost her own mother (maternal grandmother) in the past six months.

didn't know where mother was.  As of DCFS's February 16, 2021 status review report, mother's whereabouts were unknown.

M.Y. continued to live with Lisa, appeared to be "very happy" in her caregivers' home, and had formed a close relationship with other nearby paternal relatives.  She had begun group counseling sessions at her school and was to resume individual therapy on February 3.  M.Y. told the CSW she'd like to continue living with her caregivers.

Mother had three monitored visits with M.Y. during this reporting period:  two at a park in December and one at mother's treatment facility in January.  No concerns were reported.  Mother had not contacted M.Y. since she left the treatment facility on January 25, 2021, however.  DCFS recommended the court terminate mother's reunification services.

In a March addendum for the 18-month review hearing, DCFS reported that, on February 9, 2021, mother and her substance abuse counselor called and told the CSW mother had returned to Discovery House and was re-enrolled in its residential treatment program.[8]

On February 16, the CSW met with M.Y. and her caregivers to discuss mother's return to treatment and the upcoming hearing.  M.Y. said she wanted to continue to live with her caregivers but to have visits with mother.  DCFS noted M.Y. seemed to like the stability and routine of her caregivers.  M.Y. also enjoyed spending time with Kristen and paternal great aunt.

_____

[8]     A February 24, 2021 letter from the director of outpatient services confirmed mother voluntarily entered the residential treatment program from January 31 to February 22 and then was admitted to the outpatient program.

13

M.Y. was concerned she wouldn't be able to see them if she lived with mother.

The CSW monitored two visits between mother and M.Y. at a park on February 21 and March 2, 2021. No concerns were reported. Mother was to have two-hour, weekly visits on Tuesday afternoons at the park. Mother also called M.Y. daily.

The court continued the March review hearing to May 2021 for mother's contest. DCFS updated the court on mother's progress in an April 22, 2021 addendum. As of April 15, mother was a few weeks away from completing her 90-day program. She planned to move to a sober living home that accepted mothers with children. Mother's sponsor told the CSW mother had gained insight into her past and now was taking responsibility for her actions after having been resistant at first. On April 21, 2021, mother's outpatient program reported she was in good standing and all her drug tests had been negative. Mother was attending several 12-step meetings per week and demonstrated "a strong resolve to stay sober." She also had resumed individual counseling on March 18. Mother continued to visit M.Y. weekly with no reported concerns.

For the May 5, 2021 review hearing, mother submitted letters of support from her counselor at Discovery House, her individual therapist, and her adult son. The son wrote a letter in support of her regaining custody of M.Y. Mother's drug counselor and therapist described her positive progress in her recovery. The therapist also noted mother had been successfully addressing her grief from the deaths of her parents. Both noted mother was dedicated to M.Y. and to providing her with a safe and loving home. The therapist also concluded "a mutual caring, loving, and respectful relationship exists" between mother and

14

M.Y. She had observed mother and M.Y. together in two sessions, and in both had seen "a strong bond" between them, including their laughing and joking together.

The court found mother's progress toward alleviating or mitigating the issues that led to M.Y.'s removal had been "substantial[ ] ([p]artial)." The court continued reunification services and set the matter for a section 366.25 hearing on September 21, 2021.

**6.      *Termination of reunification services***

In its status review report filed August 25, 2021, DCFS noted M.Y.'s wishes—to remain in paternal cousin's home but be able to visit mother—had not changed. In July, when the CSW probed M.Y. about her "worries and wishes," M.Y. expressed concerns " 'about Court' " and " 'going back home to my mom's.' " She said she wanted " 'to stay at Lisa's.' " On further questioning, M.Y. explained she was worried about mother " 'possibly getting back on drugs' " or " 'los[ing] our apartment or house again.' " M.Y. gave the CSW consent to tell the court she had " 'really big worries' about living with mother."

Mother had been living at a sober living facility since the end of February 2021. She planned to move to a different sober living facility for families on September 1, in anticipation of M.Y. living with her. Mother expected to graduate from her program soon. Mother continued to attend several meetings each week and to consult with her sponsors. Mother's counselor reported she tested randomly for drugs 43 times during her outpatient program and each test had been negative.

Mother consistently visited M.Y. At the beginning of July 2021, mother's weekly visits with M.Y. were extended by an hour. The monitor continued to report no concerns. Mother and M.Y.

15

"appear[ed] to get along well and have an enjoyable time during their visits."

Mother appeared "to be doing well in her sobriety," and continued "to have heavy support from her sponsor, drug counselor, and sober living program." The report went on, however, to describe mother's "yo-yo pattern" of recovery and relapse, noting her struggle to remain sober after completing each treatment program had resulted in the detention and re-detention of her children. DCFS thus found the likelihood of mother relapsing—and the risk of harm to M.Y.—remained high. It recognized "the extraordinary efforts" mother made to regain sobriety but nevertheless recommended the court terminate reunification services.

At the September 21, 2021 hearing, the court found mother's progress in alleviating or mitigating the issues requiring M.Y.'s placement had "not been substantial" and terminated mother's reunification services. The court signed a stipulated attorney order, prepared by M.Y.'s counsel, that mother have six hours of weekly visitation with M.Y.: three hours monitored and three hours unmonitored—with conditions—in a public setting. The court gave DCFS discretion to liberalize visitation.

### 7. *Permanency planning*

DCFS's section 366.26 report, filed December 30, 2021, summarized the type and frequency of visits between mother and M.Y. throughout the case; it included about 35 pages of visitation case notes. The visits were positive and M.Y. was happy to see and engage with mother. Mother played, sang, danced, and exercised with M.Y., read with her and helped her with homework, brought her gifts, activities, and healthy snacks,

encouraged and asked about her, attended to her needs and comforted her, appropriately disciplined and redirected her, and generally interacted positively with her. M.Y. and mother were affectionate with and expressed their love for one another. DCFS intended to liberalize mother's second weekly visit from monitored to unmonitored, beginning in January, as she had been doing well and continued to test negative.

The report also included DCFS's analysis of the inapplicability of the beneficial parent relationship exception to adoption. DCFS found there was "no doubt that mother and child are bonded." Nevertheless, it "question[ed]" how mother's interaction with M.Y. could "rise to the level of a parental role through weekly brief visits in the park." (Bold type omitted.)

The analysis included M.Y.'s earlier statements that she had concerns about living with mother and wanted to stay with her caregivers " 'because she likes her home, her life, her school and does not want to leave.' " M.Y. had said she "loves her mother[ ] and is 'worried' about returning to live with her mother, because 'What if she starts doing drugs again? What if she loses our house again? What happens to me?' " DCFS found M.Y. thus "d[id] not view mother as a safe, stable, parental figure in her life."[9]

DCFS recommended adoption by the current caregiver as M.Y.'s permanent plan: "[M.Y.] is very attached to her caregiver,

---

[9]     In an addendum filed January 11, 2022, DCFS noted, under a heading about the child's statement about the prospective adoption, "The child is too young and not required to make a statement." M.Y. was a few months shy of her tenth birthday at the time.

17

who is eager to provide a permanent, nurturing and stable home for her through adoption. [¶] . . . The child has demonstrated a strong, loving bond with caregivers." The caregivers intended to support "ongoing contact" between mother and M.Y., as long as mother maintained sobriety.

On January 10, 2022, mother filed a section 388 petition. She asked the court to reinstate reunification services, return M.Y. to her custody when she found housing, or order unmonitored visits for nine hours each week, with overnight visits when mother secured housing. Mother attached various letters of support, her own statements, and a 2020 permanency planning report that noted M.Y. said "she would like to go home with her mother, but that she likes living with Lisa [and her husband] and wants to stay there if she does not go back home to the mother." The court set a hearing on mother's petition and M.Y.'s permanent plan for February 23, 2022, which ultimately was continued to March 23, 2022.

DCFS responded to the section 388 petition in an interim report filed February 14. A DI spoke to M.Y. about mother's petition. M.Y. responded, " 'I want to stay with Lisa.' " M.Y. " 'fe[lt] safer with her.' " The DI asked M.Y. about her visits with mother. She said, " 'They are fine[;] we visit only in parks.' " M.Y. said she felt safe visiting with mother but " 'only if [the visits] are in the parks near the home.' " The DI asked M.Y. how she felt about mother wanting to reunify with her. M.Y. "looked down and became quiet. She [then] looked up and appeared hesitant," stating, " 'I only want to visit with my mom[,]' " adding, " 'Will you make sure my mom does not know it is from me[?]' " The child clarified she was not afraid of mother; rather, she did not want to hurt mother's feelings.

18

M.Y. reiterated she wanted " 'to stay with Lisa and visit my mom.' " The DI also spoke to Lisa, who relayed that M.Y. " 'loves her mom but she worries about going back. She is worried that her mother is uncertain.' "

According to the report, the next day the CSW gave the DI a letter M.Y. wanted to give to the judge. She wrote, " 'Dear Jadge Can you stop givieng more and more expanding the time Make a dison soon Love, [M.Y.]' "[10] M.Y. apparently had given the note to the CSW the month before.

The DI interviewed mother by telephone. Mother had been clean for over a year, had completed her programs, and was living with a friend while wait-listed for housing. Mother admitted she was in contact with father, however, and they believed Lisa was " 'a monster.' " Mother accused Lisa of lying and blocking contact between M.Y. and father and her brothers. She insisted Lisa would " 'cut [her] off' " from M.Y. if adoption were granted. Mother accused DCFS of failing to consider the strength of her bond with M.Y. The DI also contacted mother's former neighbors and "sober living sister." They described mother's bond with M.Y. and perseverance in maintaining her sobriety.

DCFS "strongly recommend[ed]" the court honor M.Y.'s wishes and deny mother's section 388 petition, and the permanent plan of adoption "go forward." In a last minute information, DCFS reproduced a text message mother had sent Lisa, essentially accusing her of having manipulated M.Y. to write the letter to the court. Mother called Lisa a "f---ing

---

[10] The copy of the note attached to the report cuts off after the "ex" in "expanding."

19

monster," declared they were "open enemies," and accused Lisa of dissolving M.Y.'s "entire family of origin."

8. ***Combined section 388 and section 366.26 hearing***

DCFS filed its final status review report on March 8, 2022. It noted M.Y. was happy and comfortable living with Lisa and her husband, and had "a strong bond with the prospective adoptive parents." M.Y. had made progress in school, where she attended weekly group counseling sessions. Lisa had not reported any concerns about M.Y.'s mental or emotional health.

At the combined hearing on March 23, the court admitted into evidence DCFS's reports with attachments and took judicial notice of the case file, as well as the file in the earlier dependency case. Mother did not object. The court also admitted mother's exhibits: mostly letters from friends, relatives in Oregon, her doctor and therapist, and personnel from her treatment program.

Mother testified in support of her section 388 petition and M.Y.'s permanent plan. She spoke about completing her treatment program, her continued participation in aftercare, and her living arrangements. She also testified about her bond with M.Y. and her twice weekly visits with M.Y. in the park— both unmonitored since January 2022. Mother described her interactions with M.Y. during those visits and their nightly calls. She also testified about attending M.Y.'s doctor's appointment and participating in a telephonic teacher-parent conference. Mother wanted to remain involved in M.Y.'s life even if M.Y. continued to live with Lisa. She believed she could provide M.Y. with continued emotional support. Mother also addressed her concerns about M.Y.'s caretakers.

After mother testified, the court heard argument on the section 388 petition and denied it. The court commended

mother on her hard work to maintain her sobriety but found her circumstances were still changing, and it was not in M.Y.'s best interest to offer more reunification services.

As to M.Y.'s permanent plan, mother's counsel argued the beneficial parent relationship exception to adoption applied and asked the court to order DCFS to assess legal guardianship as M.Y.'s permanent plan. Counsel argued mother had visited M.Y. regularly, and mother's interactions with M.Y. were beneficial to M.Y. As to detriment to M.Y.—the final element of the exception—counsel explained the court must assume M.Y. would never see mother again if parental rights were terminated. Counsel noted M.Y. consistently asserted she wanted to continue visiting mother and argued it would not be in M.Y.'s best interest to "terminate mother's parental rights and to cut off this loving, caring parental relationship."

M.Y.'s counsel, who also represented M.Y. in her first dependency case, asked the court to terminate parental rights. Counsel acknowledged mother and M.Y. had "really great visits," but the visitation notes did not indicate M.Y. had a "substantial, positive emotional attachment to her mother." Counsel noted M.Y. never had issues ending visits and never asked for more extensive visits with mother. Counsel argued M.Y. had expressed "time and time again, throughout the last two years, that she doesn't want to live with her mom. She wants to be adopted and have a more stable, predictable childhood." DCFS's counsel joined in minor's counsel's arguments, adding the unmonitored visits had been very limited and in a structured setting, and mother's recent behavior of lashing out at the caretakers seemed to be placing M.Y. at risk.

The court agreed mother had visited M.Y. consistently and loved M.Y. But, the court noted, M.Y. had been removed once before, followed by a period of instability while in parents' care due to their substance abuse and unstable housing. The court also noted M.Y. had been out of mother's care for the past two and a half years. The court continued,[11]

> "And I do agree that although mother has had good visits, and the child seems to enjoy those visits, they've been in a structured setting and have been limited in terms of their time that they've been able to spend together, and I don't see any evidence that shows such a substantial, emotional positive attachment that would satisfy prong two.
>
> "The court is also noting that [M.Y.] does not want to return to her mother. She has not even asked for more time with her mother other than what has been ordered by the court."

The court did not give great weight to mother's therapist's letter about the bond between mother and M.Y., noting the therapist's limited contact with M.Y.[12] The court continued, "And I'm also noticing [M.Y.'s] desire for permanency and

---

[11]     Mother became upset and repeatedly interrupted the court during its ruling. She left the courtroom before the court finished.

[12]     M.Y.'s counsel had argued the therapist, who was not a bonding expert, was not qualified to determine mother and M.Y. shared a bond, having observed them together only twice.

stability, which her parents have not been able to give her, so far, and she's been getting with the caregiver; and the anxiety and the worries that she has about living with her mother, her mother relapsing again and . . . not knowing what her housing situation is going to be like."

Finally, as to detriment, the court did "not find that the termination of this [parent-child] relationship outweigh[ed] the potential benefit to [M.Y.] being adopted." The court found any harm "or trauma" M.Y. may experience from the termination of the relationship with mother "is outweighed by the benefits of stability and permanency provided by her current caregivers." The court recognized M.Y. knew mother was her mother but explained M.Y. also knew "what it's been like living with her mother and father, and that has, in the past, been very uncertain and traumatic and unstable."

Accordingly, the court found mother had failed to demonstrate the second and third prongs of the beneficial parent relationship exception to adoption. Specifically, mother had maintained regular visitation but "the benefit accruing to the child from the relationship with the parent is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption and that adoption is in the best interests of the child." Finding M.Y. was adoptable and no exception to adoption applied, the court terminated mother's and father's parental rights and designated the current caregiver as the prospective adoptive parent. Mother appealed.[13]

_____

[13]    In her opening brief, mother states this appeal addresses only the order terminating parental rights.

23

**9.** *Facts relating to ICWA*

On August 19, 2019, father signed and filed an ICWA-020 form indicating he had "no Indian ancestry as far as [he] kn[e]w." At the detention hearing, the court confirmed with father that he had no Indian ancestry. The court found it had no reason to know ICWA applied as to father. Father also told the investigator, in September 2019, he had no Indian ancestry.

As to mother, an ICWA-010(A) form attached to the August 16, 2019 petition stated DCFS questioned mother on August 12 about the child's Indian status. The form states, "Mother reports the maternal grandmother is Cherokee Indian. On 9/20/12, the Court found ICWA does not apply." The detention report included a similar note, adding, "Mother stated that she is not certain if the child is registered with the Tribe."

On October 2, 2019, mother told the DI that she had no American Indian ancestry. The October 10 jurisdiction report stated ICWA "does or may apply." The report again noted that, in September 2012, the court had found ICWA did not apply to M.Y.

Mother signed and filed an ICWA-020 form on October 11, 2019, indicating she had "no Indian ancestry as far as [she] kn[e]w." At mother's arraignment that same day, the court noted mother had indicated she had no Indian ancestry and found ICWA did not apply as to her. DCFS's subsequent status review report noted the court found it had no reason to know M.Y. is an Indian child as defined under ICWA and had not ordered notice to any tribe or the Bureau of Indian Affairs (BIA).

A June 20, 2011 minute order from the earlier dependency case, of which the court took judicial notice at the disposition

24

hearing,[14] states that, on May 6, 2011, the court had ordered ICWA notices be sent to two "other" Cherokee tribes. The court already had received responses to ICWA notices from the BIA and Cherokee Nation Oklahoma, and now had responses from the United Keetowah tribe, Eastern Band Cherokee, and Cherokee Nation Oklahoma. The court found the ICWA notices were "proper and complete," and the child—one of M.Y.'s older full siblings—did not "fall within the provisions of the ICWA statute," and the court had "no reason to know the child [was] an Indian child as defined by [ICWA]." The court found ICWA did not apply.[15]

## DISCUSSION

1. ***The court did not err in terminating mother's parental rights***

a. *Applicable law and standards of review*

Under section 366.26, once the juvenile court terminates reunification services and determines a dependent child is adoptable—a finding not in dispute here—it must select adoption as the permanent plan and terminate parental rights unless it finds doing so would be detrimental to the child under one of several statutory exceptions. (§ 366.26, subd. (c)(1); *Caden C., supra*, 11 Cal.5th at pp. 630–631.)

The beneficial parent relationship exception applies where the parent has "maintained regular visitation and contact

---

[14] The court also took judicial notice of the judicial file of the earlier case at the section 366.26 hearing.

[15] That minute order relates to the hearing at which the court terminated parents' rights to M.Y.'s full sibling T.Y.

with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) Our Supreme Court recently clarified the three elements a parent must prove, by a preponderance of the evidence, to establish the exception: (1) the parent's regular visitation and contact with the child; (2) the child's "substantial, positive, emotional attachment to the parent," "the continuation of which would *benefit* the child"; and (3) that the termination of "that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at pp. 631, 636.)

In assessing whether terminating parental rights would be detrimental to the child, the court must perform a "case-specific inquiry," asking, "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' [Citation.] When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C., supra*, 11 Cal.5th at pp. 633–634.)

"A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on another ground in *Caden C., supra*, 11 Cal.5th at pp. 637–638, fns. 6–7.) Rather, the parent must show the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

In evaluating the existence of a beneficial parental relationship, courts consider several factors, including "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 576.) The *Caden C.* court clarified, however, that a parent's failure to make adequate progress with her case plan or "continued struggles" with issues that led to the dependency—standing alone—do not preclude application of the exception. (*Caden C., supra*, 11 Cal.5th at pp. 637–638.)

We review the court's findings as to whether the parent has maintained regular visitation and whether the child would benefit from continuing the parent-child relationship for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) In so doing, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts,' " and we will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) Where, as here, a parent contends the court erred in finding she did not meet her burden of proof, we must determine whether "the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4, 1010, fn. 7.)

"[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [her] parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at p. 640.)

b.  *The court did not err in finding the beneficial parent relationship exception did not apply*

It is undisputed mother regularly visited M.Y., as the court found. As to the second and third elements, the court found mother had not demonstrated her parent-child relationship with M.Y. was so substantial and positive that its termination would be detrimental to M.Y. The court found that any "trauma" or detriment M.Y. may experience from its loss was outweighed by the benefits of stability and permanence M.Y. would receive through adoption.

Mother contends the court relied on improper factors under *Caden C.*, including considering M.Y.'s earlier dependency case, "inferring that [m]other's sobriety problems were ongoing," failing to consider the parent-child relationship within the visitation that had been allowed, and comparing mother's bond to M.Y.'s bond with her caregivers through their day-to-day interaction. Mother also argues that, because DCFS never asked M.Y. how she felt about being adopted and the possibility of not seeing mother again, the juvenile court could not properly have weighed the detriment to M.Y. from severing the parent-child relationship against the benefits of adoption.

The record demonstrates mother and M.Y. had consistently positive visits—most recently, twice a week, usually at a park, for two to three hours. Mother and M.Y. also talked on the phone or by FaceTime almost daily. DCFS and its counsel, M.Y.'s

28

counsel, and the court all agreed mother's visits with M.Y were positive—"great" even—and M.Y. enjoyed them. DCFS also had reported there was "no doubt that mother and child are bonded."

M.Y.'s counsel argued, however, the visitation notes did not demonstrate M.Y. had a "substantial, positive emotional attachment to her mother." Counsel noted M.Y. "was perfectly fine leaving the visits" and had "never asked the worker, her mom, her caregiver[,] or even [counsel] for more time with her mom, for overnight visits, for weekend visits, for [a] longer period[ ] of time rather than those two to four hours a week." Counsel argued M.Y.—who was almost 10 years old and could voice her desires to the CSW—had "not once questioned those visits, and why she's not getting more." DCFS's counsel added mother had only three hours of unmonitored visits a week, and asserted, "it's very hard to build a true bond with the minor in such a short, limited structured setting."

The court agreed with counsel that the visits were positive but had been "in a structured setting" and "limited" in terms of the time mother and M.Y. were able to spend together. The court found the evidence did not show "such a substantial, emotional positive attachment that would satisfy prong two."

We agree with mother the evidence describing her visits with M.Y. demonstrated she and M.Y. shared a positive relationship that benefitted M.Y. Contrary to DCFS's questioning of how mother's interaction with M.Y. during visits in the park could "rise to the level of a parental role," the monitor's notes show mother in fact parented M.Y. during their visits. (See, e.g., *In re J.D.* (2021) 70 Cal.App.5th 833, 856–857 [visitation logs demonstrated mother acted in parental role during visits by comforting child, encouraging him, teaching him,

29

setting limits, and expressing love and affection].)  Mother also went to M.Y.'s doctor's appointment and participated in a parent-teacher conference.  And, as the court acknowledged, M.Y. knew mother was her mother.  The visitation logs reflect M.Y. called mother " 'mommy,' " appeared happy and comfortable with mother, and looked forward to visits.

That their visits were structured and limited to a few hours each visit, does not—on its own—support a finding M.Y. did not have a positive emotional attachment to mother or that she would not benefit from continuing their relationship.  As our high court explained, "it is not necessary—even if it were possible—to calibrate a precise 'quantitative measurement of the specific amount of "comfort, nourishment or physical care" [the parent] provided during [his or] her weekly visits' " in assessing whether " 'the child would benefit from continuing the relationship.' " (*Caden C., supra*, 11 Cal.5th at p. 632.)  Although mother's visits with M.Y. were limited to a setting primarily conducive to play—and M.Y. described the visits as "fun"—the logs show mother engaged with M.Y. on a level beyond that of a "friendly visitor." (*In re Katherine J.* (2002) 75 Cal.App.5th 303, 318–319.)

Further, the record shows M.Y., who had spent at least half her life with mother, derived a benefit from their continued relationship.  Even when M.Y. was emphatic that she did not want to return to mother's care, she clearly—and repeatedly—expressed her wish to continue visits with mother.

M.Y.'s counsel noted M.Y nevertheless was perfectly fine leaving her visits with mother.  True, but the case notes indicated M.Y. became upset or was disappointed when mother had to take calls from her sponsor and her attorney during visits, as well as when mother told M.Y. she would have to reschedule a visit due

30

to the monitor's unavailability. When M.Y. learned there would be a makeup visit, the monitor described her as "giddy."

And, as mother notes, contrary to DCFS's assertions and M.Y.'s counsel's argument at the hearing—repeated by the court—M.Y. did ask for more visits with mother, at least once, in the first year of her dependency. As evidenced in DCFS's section 366.26 report, in July 2020, M.Y. told the CSW " 'she would like to see her mother more [often].' " The CSW responded " 'she would like that too, but that . . . mother worked a lot.' " Around that time, M.Y. also said she wanted to live with mother or have mother live with her and her caregivers. In May 2020, M.Y. had told the CSW she liked having unmonitored visits with mother " 'because it could just be her and her mother.' " Nevertheless, there is no evidence M.Y. asked about more time with, or living with, mother over the next year and a half, as the dependency continued, and mother relapsed.

In any event, to the extent the court erred in finding mother and M.Y. did not share "*such* a substantial, emotional positive attachment" (italics added) because their visits were limited in nature and structure, that error is harmless. That mother's relationship with M.Y. may have met the threshold of constituting a "substantial, positive, emotional attachment" does not mean M.Y.'s attachment to mother was of such a degree as to outweigh the benefits of adoption. The court here specifically considered whether the harm of severing the parent-child relationship outweighed the benefits of stability and permanency that adoption would provide and found it did not. (*Caden C., supra*, 11 Cal.5th at pp. 633–634 [termination of parental rights is " 'detrimental to the child *due to*' the child's beneficial relationship with a parent" when "the harm of severing

31

the relationship outweighs 'the security and the sense of belonging a new family would confer' "].)

As the record demonstrates the court did not base its evaluation of the strength of M.Y.'s emotional attachment to mother on the limited nature of their visits *alone*—which we address below—we are convinced the court properly examined the degree of that attachment when finding the termination of mother's parental rights would not be detrimental to M.Y., as compared to the benefits of adoption. Nor did the court run afoul of the directives in *Caden C.* in so finding, as we discuss. (Cf. *In re B.D.* (2021) 66 Cal.App.5th 1218, 1228 [remanding for new section 366.26 hearing where record did not convince reviewing court that juvenile court examined the nature of the relationship before the dependency or visits during the proceeding, and the court relied on improper factors in finding lack of substantial, positive, emotional attachment].)

The court also considered "the overall impact mother's past behavior had on [M.Y.]." (Cf. *In re J.D.*, *supra*, 70 Cal.App.5th at p. 863 [remanding in part because record contained "no assessment of the overall impact mother's past behavior had on" child where juvenile court did not have the benefit of *Caden C.* when it found the beneficial parental relationship exception did not apply].) Addressing M.Y.'s relationship with mother before the current dependency, the court noted that period was "unstable and rocky due to the parents' substance abuse issues and unstable housing." The record supports the court's observation. Even before DCFS became reinvolved with the family in August 2019, M.Y. had experienced instability and been intermittently out of mother's care. When parents became homeless in 2018, M.Y. spent

nights in Lisa's home while parents stayed in a camper out front. Mother relapsed, was homeless again, and left M.Y. with relatives in Oregon. After returning to California, M.Y. and mother stayed with a relative and then lived in different hotel rooms. M.Y. did not understand why she left Oregon.

These events clearly traumatized M.Y. The court noted M.Y.'s anxieties. M.Y. feared mother would relapse and again lose her housing. Given M.Y.'s repeated concerns and express desire not to return to mother's care, the court reasonably could infer mother's pattern of sobriety and relapse, and continued inability to find stable housing, negatively affected M.Y.'s emotional attachment to mother, or at least diluted the strength of that attachment. (See *Caden C., supra*, 11 Cal.5th at p. 634 ["[i]n many cases 'the strength and quality of the natural parent/ child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home"].)

Contrary to mother's contention, the court's consideration of mother's struggles was not impermissible under *Caden C.* While a parent's issues are not "a categorical bar" to applying the beneficial parent relationship exception, *Caden C.* made clear that "a parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental." (*Caden C., supra*, 11 Cal.5th at pp. 637, 639.) The court here considered how mother's issues that led to the dependency and termination of reunification services affected M.Y.'s relationship with mother. In other words, mother's struggles informed the court's analysis as to whether M.Y. would "benefit from continuing the relationship and be harmed,

33

on balance, by losing it"—a question to which a parent's case issues are relevant under *Caden C.* (*Id.* at p. 638.)

We also can infer from the record that the court considered how M.Y. "would be affected by losing the parental relationship" when it determined any harm M.Y. might experience was outweighed by the benefits she would receive through adoption. (*Caden C., supra*, 11 Cal.5th at p. 633.) The court noted M.Y. desired permanency and stability, which her parents had been unable to give her, but that she had been getting from her caregivers. The court commented on "the anxiety and the worries [M.Y.] has about living with her mother," as well as the fact M.Y. did not want to return to mother and had not asked for more time with her.[16]

As an initial matter, we do not view the court's remark as improperly "comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Caden C., supra*, 11 Cal.5th at p. 634.) Rather, the court was assessing the importance to M.Y.'s wellbeing of permanence and stability. That assessment directly related to the court's evaluation of whether any harm M.Y. would experience if mother no longer were in her life outweighed those benefits M.Y. would receive from adoption. (*Ibid.*)

Substantial evidence supports the juvenile court's finding that the benefits of adoption—permanency and stability— outweighed the benefit M.Y. would receive from maintaining her parental relationship with mother. As DCFS's reports and the

---

[16] M.Y. asked for more time with mother at one point in 2020, but there is no evidence that she asked for more visits, or a different arrangement, after that.

court noted, M.Y. decidedly did not want to reunify with mother and repeatedly expressed her anxiety about returning to mother's care. She wanted permanency. She consistently stated she wanted to live with Lisa (and her husband). M.Y. felt " 'safer with her.' " Yet, she didn't want mother to know her wishes so as not to hurt her feelings. M.Y.'s caregivers in turn were committed to giving her a stable, permanent home. Mother presented no evidence they could not provide for M.Y.'s needs other than to testify to "minor" concerns she had about their not taking seriously M.Y.'s predisposition toward diabetes and sun sensitivity inherited through mother's family. Moreover, the court found credible M.Y.'s letter to the court, describing it as "calling out for . . . a decision . . . and . . . to be able to have a stable environment where she knows what's going to happen from day-to-day."

Undisputedly, M.Y. also consistently said she wanted to have visits with mother. She wanted " 'to stay with Lisa and visit my mom.' " Mother contends the court failed to consider the detrimental effect terminating her parental rights would have on M.Y. given her desire to continue to visit mother, even if she stayed with Lisa. Mother argues that, because DCFS failed to ask M.Y. about *adoption*—that it could mean never seeing mother again—as opposed to with whom she wanted *to live*, the court could not properly assess whether terminating parental rights would be detrimental to M.Y. when balanced against the benefits of adoption.[17]

---

[17] Mother's counsel seems to contend DCFS *purposefully* did not ask M.Y. about her feelings about adoption—stating she was too young to make a statement on the subject—

We disagree.  DCFS's reports were before the court.  It was aware M.Y. wanted to visit mother.  We can infer it took M.Y.'s wishes into account when considering possible detriment from losing her relationship with mother.  Moreover, although M.Y. wanted to visit mother, she wanted to do so within limited parameters.  In the month before the section 366.26 hearing, the social worker asked M.Y. if she felt safe visiting mother.  M.Y. responded, "Yes, only if they [the visits] are in the parks near the home."  In other words, M.Y. felt comfortable having temporary contact with mother only in a neutral setting close to her caregivers.

---

"to . . . avoid allowing [M.Y.] to repeat her wishes to keep visiting with mother."  We disagree.  DCFS fully documented M.Y.'s wish to visit with mother.  We find it curious DCFS deemed M.Y. unable to state her feelings about adoption given her other statements.  Indeed, M.Y.'s counsel argued M.Y. was old enough to make her wishes known to the CSW.  But the record does not support counsel's insinuation.

We agree with mother, however, that DCFS's "assessment" in its section 366.26 report of the inapplicability of the beneficial parent relationship exception—and other areas of DCFS's reports —took on the role of an advocate rather than an objective reporter.  Nor, as mother asserts, did the analysis always abide by the directives in *Caden C.*  Nothing suggests the juvenile court blindly followed that analysis, however.  We have concluded the court adhered to *Caden C.* in assessing whether termination of parental rights would be detrimental to M.Y.  Moreover, at the hearing, mother's counsel went through what the court was and was not to consider under *Caden C.*, M.Y.'s counsel discussed *Caden C.* and one of its progeny, and the court itself referred to *Caden C.* when issuing its ruling.

36

Thus, the juvenile court implicitly found that, even if M.Y. were upset if she could not see mother again, her statements demonstrated her emotional attachment to mother was not significant enough to cause detriment if severed when balanced against the security and sense of wellbeing M.Y. would gain from adoption by her caregivers of two and half years. (See *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) Mother's testimony, and letters of support describing her bond with M.Y., did not compel a different result. (*In re I.W., supra*, 180 Cal.App.4th at p. 1528.) We will not reweigh that evidence. (*Caden C., supra*, 11 Cal.5th at p. 640.)

Finally, we address the notion that implementing legal guardianship as M.Y.'s permanent plan would preserve the parent-child relationship and ensure M.Y. continues to have visits with mother, while allowing M.Y. to remain with her caregivers. Even though M.Y.'s return to mother's custody was not a consideration at this stage of the proceeding (*Caden C., supra*, 11 Cal.5th at p. 638), the court reasonably could conclude that, unless adopted, M.Y. would continue to be plagued by her " 'big worries' " about returning to mother's care. "The . . . Legislature recognized that, 'Although guardianship may be a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature.' " (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.) Accordingly, only through adoption could M.Y. be assured of receiving the stability and permanence she had "call[ed] out" to the court to provide her.

We commend mother on maintaining her sobriety, and we have no doubt mother and M.Y. love each other. But the issue here is not simply whether a bond existed between mother and

37

her daughter.  (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 396, disapproved on another ground in *Caden C., supra*, 11 Cal.5th at p. 638, fn. 7.)  Rather, "[t]he question is whether that relationship remained so significant and compelling in [the child's] life that the benefit of preserving it outweighed the stability and benefits of adoption." (*Ibid.*)  We cannot say the juvenile court abused its discretion in finding the benefit M.Y. received from her relationship with mother did not.  Accordingly, the court did not err in finding the beneficial parent relationship exception inapplicable.

**2.    *Any ICWA error is harmless***

a.    *Applicable law and standard of review*

Congress enacted ICWA " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8; see 25 U.S.C. § 1902.) Both ICWA and state law define an " 'Indian child' " as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."  (25 U.S.C. § 1903(4); § 224.1, subd. (a) [adopting federal definition].)

State law and federal regulations implementing ICWA require juvenile courts to ask all participants in a dependency case whether they know or have reason to know the child is an Indian child and to instruct the parties to inform the court "if they subsequently receive information that provides

38

reason to know the child is an Indian child." (25 C.F.R. § 23.107(a) (2022); § 224.2, subds. (b), (c); Cal. Rules of Court, rule 5.481(a)(2).[18])  The rules also require courts to order the parents to complete an ICWA-020 form.  (Rule 5.481(a)(2)(C).)

Under California law, the juvenile courts and the child protective agencies, "(but not parents)[, have] an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.' " (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 741–742, quoting § 224.2, subd. (a).)  That duty to inquire "begins with [the] initial contact . . . and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.* (2020) 58 Cal.App.5th 275, 290, citing § 224.2, subds. (a)–(c).)

As of January 1, 2019, whenever DCFS takes a child into its temporary custody, its duty of initial inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b); *Benjamin M.*, *supra*, 70 Cal.App.5th at p. 742.) Extended family members include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent."  (25 U.S.C. § 1903(2); § 224.1, subd. (c) [adopting federal definition].)

If that initial inquiry gives the juvenile court or DCFS a "reason to believe that an Indian child is involved," then their

---

[18]     References to rules are to the California Rules of Court.

39

duty to "make further inquiry regarding the possible Indian status of the child" is triggered, which includes contacting, among others, the BIA and tribe(s). (§ 224.2, subd. (e) & (e)(2); *Benjamin M., supra*, 70 Cal.App.5th at p. 742.) And, once there is a "reason to know" an Indian child is involved, formal notice under ICWA must be given to the child's "parents or legal guardian, Indian custodian, if any, and the child's tribe." (§ 224.3, subd. (a); rule 5.481(c)(1); 25 U.S.C. § 1912(a).)

The juvenile court may find ICWA does not apply to a child's proceeding if it finds DCFS's duty of inquiry has been satisfied and there is no reason to know that child is an Indian child. (§ 224.2, subd. (i)(2); rule 5.481(b)(3)(A).) The court's finding that ICWA does not apply thus " ' "implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

We generally review the juvenile court's ICWA findings for substantial evidence, " 'which requires us to determine if reasonable, credible evidence of solid value supports' the court's ICWA finding." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777 (*Dezi C.*), review granted Sept. 21, 2022, S275578; cf. *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1004–1005, review den. Nov. 22, 2022, S276223 [reviewing court's finding that it had no reason to know a child is an Indian child for substantial evidence but reviewing decision that ICWA inquiry was adequate for abuse of discretion].)

b.    *Analysis*

Mother asserts the court erred when it did not independently inquire of mother to reconcile her initial claim of

Cherokee heritage, followed by her denial of it in her ICWA-020 form. She argues that—despite DCFS's reference to the court's 2012 finding that ICWA did not apply to M.Y.—"[i]t remains unknown why mother initially claimed . . . Cherokee Indian ancestry through maternal grandmother, and thereafter denied it." Mother notes the ICWA inquiry requirements in 2011 and 2012 were more limited than those in effect in 2019.

Mother also asserts error based on DCFS's failure to ask extended family members with whom it had contact about M.Y.'s possible Indian ancestry: specifically, paternal cousins Kristen and Lisa, paternal great aunt and uncle, and maternal uncle in Oregon.

First, we see no error in the court not asking mother directly about her Indian status. Speaking to mother, the court stated, "[Y]ou've indicated in your ICWA-020 form that you do not have any Indian ancestry as far as you know; so the court is going to find that ICWA does not apply as to the mother." Mother was present at the hearing and represented by counsel. Neither counsel nor mother corrected the court. The court's minute order from that hearing also ordered mother to inform DCFS, her attorney, and the court if she learned of "any new information relating to possible ICWA status." She never did.

More importantly, the record shows that, in connection with the earlier dependency case, the court *had* ordered, and DCFS *had* sent, notices to the Cherokee tribes and the BIA, all of whom had responded. The court found the notices were proper and complete and the responses indicated ICWA did not apply. The court here took judicial notice of the case file in the earlier case, including that order and finding. It is undisputed M.Y. and her siblings share the same biological parents. Thus, this

41

no-ICWA finding based on the BIA's and Cherokee tribes' responses in 2011 applies equally to M.Y. despite her later birth. And, in 2012 the court found ICWA did not apply to M.Y. The earlier finding, combined with parents' denials of Indian ancestry in the current case, provides substantial evidence to support the court's finding that it had no reason to know M.Y. is an Indian child.

DCFS apparently did not ask M.Y.'s extended family members about her possible Indian status under section 224.2, subdivision (b). We conclude any purported error from DCFS's failure to do so is harmless. (Cal. Const., art. VI, § 13 [state law error must result in "miscarriage of justice" to be set aside]; *Dezi C., supra*, 79 Cal.App.5th at p. 779 [case will be returned to the juvenile court for error based on inadequate ICWA inquiry only if the error was prejudicial].) The appropriate standard to determine prejudicial error for a defective initial inquiry is pending before our Supreme Court. (*Dezi C.*, S275578.)

The court in *Dezi C.* concluded an inadequate ICWA inquiry in these circumstances is prejudicial if "the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding." (*Dezi C., supra*, 79 Cal.App.5th at p. 779; *In re Ezequiel G., supra,* 81 Cal.App.5th at p. 1014 [majority adopts the *Dezi C.* "reason to believe" standard in assessing whether ICWA inquiry error is prejudicial in appeal from order terminating parental rights].) The Fourth District stated the rule for prejudice somewhat differently—that a defective initial inquiry requires reversal if "readily obtainable information that was likely to bear meaningfully upon whether

42

the child is an Indian child" existed. (*Benjamin M., supra*, 70 Cal.App.5th at p. 744; see *Dezi C.,* at p. 778.) We conclude any error here is harmless under either standard.

The court found it had no reason to know M.Y.'s full sibling was an Indian child *after* receiving responses from the BIA and Cherokee tribes. Moreover, remand here to inquire of M.Y.'s relatives would be futile. Maternal grandmother—the relative through whom the family's Cherokee ancestry originally had been claimed—reportedly died during the proceedings. Mother's biological father lives in Oregon, but he did not raise mother and likely would have no information about maternal grandmother's heritage. Mother's stepfather also is deceased. Nothing in the record suggests mother's brother, who lives in Oregon, would have more information about M.Y.'s potential Indian ancestry than mother has or than already was revealed in the earlier dependency case. Nor does mother claim Indian heritage on appeal.

As for paternal relatives, nothing in the record suggests they had information about paternal Indian ancestry that father did not know about when he denied ancestry. The court asked father directly if his ICWA-020 statement denying Indian ancestry was correct. He unequivocally stated, "Yes." Paternal cousin Lisa and paternal great aunt and uncle were in the courtroom. They did not contradict father or ask to be heard on the subject.

In short, it is neither "reasonably probable" that DCFS's inquiry error "affected the correctness (that is, the outcome) of the juvenile court's ICWA finding" (*Dezi C.*, *supra,* 79 Cal.App.5th at p. 781), nor is it likely further inquiry of extended family members would have produced information that "would

43

have shed meaningful light" on the child's Indian status (*Benjamin M., supra*, 70 Cal.App.5th at p. 744). Any purported error by DCFS in failing to inquire of extended family members here was thus harmless.

## DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

I concur:

NGUYEN (KIM), J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

LAVIN, J., Dissenting:

     For the reasons set forth in my dissent in *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1015–1025, I would conditionally affirm the order terminating mother's parental rights to her daughter M.Y. and remand for further proceedings. The Department of Children and Family Services could easily have asked the parents' identified family members about the child's possible Indian heritage and documented those efforts. It did not. Further, nothing in the record shows how those extended family members would have responded to questions about the child's possible Indian heritage.

                                                 LAVIN, Acting P. J.